IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

| | |
|---|---|
| STEPHEN WEAVER, | ) |
| Plaintiff | ) 1:23-CV-00258-RAL |
| vs. | ) RICHARD A. LANZILLO |
| WELLPATH, LLC, | ) CHIEF UNITED STATES MAGISTRATE JUDGE |
| Defendant | ) MEMORANDUM OPINION ON DEFENDANT'S MOTION TO DISMISS |
| | ) ECF NO. 11 |

Pending before the Court is Defendant Wellpath, LLC's motion to dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6). ECF No. 11. For the reasons explained herein, the motion will be DENIED.[1]

I. Introduction

Plaintiff Stephen Weaver ("Weaver") is an inmate in the custody of the Pennsylvania Department of Corrections ("DOC"). Weaver's Complaint in this action relates to medical care he received while housed at the DOC's State Correctional Institution at Albion. Defendant Wellpath, LLC ("Wellpath") is a private company contracted to provide medical care and services to inmates at DOC correctional institutions. Weaver has sued Wellpath pursuant to 42 U.S.C. § 1983, alleging that it acted with deliberate indifference to his serious medical needs in violation of his rights under the Eighth Amendment of the Constitution. Wellpath contends that the

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge in this case pursuant to 28 U.S.C. § 636(c).

allegations of Weaver's Complaint establish that his claims are barred by the applicable statute of limitations and, alternatively, that his allegations fail to state a claim.

II.     Factual and Procedural Background

The following facts are taken from Weaver's Complaint (ECF No. 1) and, for purposes of Wellpath's motion to dismiss, accepted as true. Weaver is a sixty-six-year-old man who has been in the custody of the DOC since 2015. In February 2016, he underwent cataract surgery upon his right eye. In March 2018, Weaver underwent cataract surgery upon his left eye. This second surgery was performed by Anthony Sala, DO, in Erie, Pennsylvania. Following this second surgery, Dr. Sala confirmed that Weaver was experiencing "no problems." During Weaver's follow-up appointment after the second surgery, Tracie Jones, OD, recommended a follow-up in two years.

On the morning of October 9, 2018, Weaver awoke to find that his vision in his left eye was significantly impaired and that he could only see shadows and colors. That same day, Weaver submitted a sick call slip to the medical department, but he received no response. Although Weaver did not know it at the time, he had suffered a detached retina on or about October 9, 2018. This was a serious medical condition that required prompt medical attention to reattach the retina and restore Weaver's vision in his left eye. Weaver followed up with the medical department concerning his condition on October 12, October 28, and November 14 but received no response to his sick call slips. During that same period, Weaver submitted requests to staff about the same issue.

On October 15, he submitted Form DC-135A, writing: "woke up on the morning of 10/9/18 and couldn't see anything with my left eye. To this date, my vision hasn't returned. I wrote medical about it on 10/9/18 and also on 10/12/18 and still haven't received a reply. I would like to see an

eye Dr. as soon as possible. Thank you!" Weaver did not get a response to this request. He submitted similar requests on Form DC-135A on October 18 and October 23, but he also did not get any response to those requests. On October 31, 2018, Weaver was called to medical for his annual flu shot and relayed his vision problems to the nurse, but he still did not receive any care for his vision. On December 14, 2018, while Weaver was in the medical department for his annual physical, he again raised his vision problem and was advised that it would be addressed. However, nothing was done.

On December 18, 2018, Daniel Stroup, PA, wrote that Weaver was a "no-show" for his seven-month follow-up appointment after cataract surgery. However, Weaver was never notified that he had an appointment on December 18, 2018. All medical passes notify inmates that "[f]ailure to respond to pass will result in misconduct." Weaver was not issued a misconduct for missing his scheduled appointment. Weaver submitted another request to the medical department on January 15, 2019, writing: "I lost the vision in my left eye on the morning of 10/9/18. I've written medical at least 6 times to see an eye dr but I haven't received a reply to any of my requests. Can anyone tell me why? Am I being ignored for some reason? Please respond to this request thank you." Weaver received no response to this request.

On or about April 5, 2019, Weaver was seen by Nurse Gasser, who advised Weaver that she would put him on a list to be seen by an eye doctor. On May 23, 2019, Weaver wrote a request to the medical department because he still had not been seen by a doctor or received any diagnosis or treatment for his vision loss. On June 7, 2019, Weaver was called to the medical department and seen by Erin Hayton, CRNP, who advised him to make a written request either to her or Nurse Gasser to see an eye doctor.

3

On June 12, 2019, Weaver sent an inmate request to staff to Ms. Gasser, stating: "I had my left eye operated on back in March 2018.  My vision completely failed in that eye several months ago. I was told I would be put down to see the eye DR but so far that hasn't happened.  My left eye has been hurting a lot and I get a lot of flashes of light. My right eye is starting to give me problems due to the strain of trying to see. Hopefully, you can help me be seen by a DR. Thank you very much."

Finally, on July 24, 2019, Weaver was seen for an ophthalmologic examination by Dr. Timothy Barron, who noted: "patient lost vision in December after IOLS of both eyes by Dr. Sala. Needs referral to Sala for evaluation of the left eye." An IOLS, or intraocular lens implant, is a tiny artificial replacement for the lens of the eye, which is implanted in the eye during cataract repair surgery. Dr. Barron assessed Weaver with potential retinal detachment in his left eye and planned for him to be referred to Dr. Sala.

Weaver could not be scheduled for a consultation with Dr. Sala, a medical provider whose office is outside of the prison facility, without approval from "collegial review."  "Collegial review" is a process maintained by Wellpath that requires all outside medical consultations and treatments, other than emergency care, be approved by a board composed of Wellpath employees other than the treating physician. The treating physician's order or treatment plan is implemented only after approval.  The purpose of the "collegial review" process is to ensure that Wellpath's medical costs are kept as low as possible.

Weaver's medical record reflects no further effort to return him to Dr. Sala or any other mention of his vision loss until December 12, 2019, when he was seen by Daniel Stroup, PA-C, who simply noted that Weaver was "experiencing vision changes." Although Weaver was seen in the medical department during 2020, his records include no mention of his loss of vision or the

recommendation that he be returned to Dr. Sala. The next note related to Weaver's vision loss was not entered until February 2, 2021, when Hayley Nieves, PA-C, noted that his left eye vision was completely gone, and his right eye vision was "starting to go." PA Nieves recorded that Weaver needed both glasses and a consultation with an ophthalmologist, but Weaver was not referred to an ophthalmologist.

Four months later, on June 10, 2021, Kim Raines, CRNP, noted that Weaver had been blind in his left eye since approximately 2018, and was having blurry vision and difficulty seeing in his right eye. CRNP Raines noted that she would order an ophthalmology consultation and that Weaver had an appointment in December. There are no further notes about Weaver's vision loss until December 1, 2021, when Lisa Baird, MD, noted that he was suffering from "blurry vision intermittently."

On December 23, 2021—three years and two months after Weaver first reported his blurry vision—Weaver was seen for an ophthalmologic examination by Chris Bobeczko, OD, who planned to refer him to a retinal specialist based on the blurred vision in his left eye. This was the same course of action recommended by Dr. Barron on July 24, 2019, two and a half years earlier. Finally, on February 15, 2022, Weaver was seen by Anthony Sala, DO at the Erie Eye Clinic. Dr. Sala noted: "Patient states he is having pain in both eyes and it does keep him up at night on occasion. States the vision is on and off in the right eye, 'some days it is better than others and the left eye is gone.' States he woke up one morning and he had no sight in left eye, onset 2018." Dr. Sala assessed Weaver with left eye retinal detachment and planned to refer him for further evaluation and treatment "ASAP."

On March 15, 2022, Weaver was seen at a University of Pittsburgh Medical Center facility by Kunal Dansingani, MD, who assessed him with "chronic funnel retinal detachment left eye,"

and planned for "Pars plana vitrectomy," a surgical procedure to remove scar tissue in the eye which affects the retina and glasses refraction for the right eye. Weaver finally underwent surgery to repair his detached retina in his left eye by Dr. Dansingani at UPMC Mercy on April 26, 2022.

On May 9, 2022, Weaver was seen in the medical department for complaints of pain, 7/10, in his left eye. He was seen by Zachary Jacobson, PA, who noted that Weaver could not see much out of his left eye except faint light, and that his pupil was not reacting to light. On June 1, 2022, Weaver was seen by Dr. Dansingani, who assessed that the surgical attempt to repair his left retina was unsuccessful.

That same day, Weaver filed a grievance against the medical department at SCI Albion, Dr. Longnecker, and Wellpath. He wrote, in part: "On October 9, 2018, I began to complain about pain, discomfort, and loss of vision in my left eye. Finally, after many requests slips to medical I was seen on July 24, 2019 by the in-house eye doctor. He fitted me for new glasses and said he would send me to see Doctor Sala, the eye surgeon in Erie. I was not seen by an eye specialist until Feb. 15, 2022, and his assessment was that I had a detached retina. Finally, on April 26, 2022, I was sent to UPMC for surgery which was unsuccessful due to the length of time the retina was detached… I have completely lost the vision in my left eye. Had I been seen in a timely manner I would not have lost my sight."

On June 23, 2022, Weaver's grievance was denied on the basis that "you had multiple visits with providers that you did not bring any of the vision changes up as an issue." Weaver timely appealed, writing: "I placed a request/sick call in for my eye, at which I was told I was/would be placed on the list for the eye doctor… I was told I had to be patient, there was a list… I believed that the medical department had my best interest, only to find out that they did not!... Their neglect caused me to lose vision in my eye." The facility manager denied this appeal on September 20,

2022, writing, "your medical care is provided by licensed medical professionals who have the knowledge to determine the appropriate treatment."

Weaver submitted his final appeal, which was referred for additional review on December 29, 2022. The notice of appeal stated: "please be advised that the final review decision will be delayed pending review by the office to which it has been referred. Upon completion of this review, however, a determination will be made and you will be provided with a final appeal decision in writing." Weaver has never received a final denial of his grievance or any other response from the Secretary's Office.

Weaver filed his Complaint against Wellpath, the sole defendant, on August 29, 2023. *See* ECF No. 1. His Complaint asserts two claims against Wellpath: Count I, an Eighth Amendment claim for deliberate indifference to his serious medical needs, *see id.*, ¶¶ 61-85, and Count II, a professional negligence claim under Pennsylvania state law, *see id.*, ¶¶ 86-97.

II. Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a Rule 12(b)(6) motion to dismiss, the court must accept as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *See U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002). The "court[] generally consider[s] only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim" when considering the motion to dismiss. *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997)).

In making its determination under Rule 12(b)(6), the court is not opining on whether the

plaintiff is likely to prevail on the merits; rather, the plaintiff must only present factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004)). *See also Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Furthermore, a complaint should only be dismissed pursuant to Rule 12(b)(6) if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 (rejecting the traditional Rule 12(b)(6) standard established in *Conley v. Gibson*, 355 U.S. 41, 78 (1957)).

While a complaint does not need detailed factual allegations to survive a motion to dismiss, it must provide more than labels and conclusions. *See Twombly*, 550 U.S. at 555. A "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Moreover, a court need not accept inferences drawn by a plaintiff if they are unsupported by the facts as explained in the complaint. *See California Pub. Employee Ret. Sys. v. The Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004) (citing *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)). Nor must the court accept legal conclusions disguised as factual allegations. *See Twombly*, 550 U.S. at 555; *McTernan v. City of York, Pennsylvania*, 577 F.3d 521, 531 (3d Cir. 2009) ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). Put another way, in assessing a motion to dismiss, while the Court must view the factual allegations contained in the pleading at issue as true, the Court is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007). Expounding on the *Twombly/Iqbal* line of cases, the Third Circuit has articulated the following three-step approach:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations

> that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)). This determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

III.   Discussion and Analysis

   A.   The face of the Complaint does not support dismissal based on the statute of limitations.

Wellpath argues that Weaver's claims must be dismissed because he filed his Complaint after the expiration of the applicable statute of limitations. *See* ECF No. 12, p. 4. The statute of limitations is an affirmative defense and, as such, it is typically not appropriate for consideration on a motion to dismiss under Rule 12(b)(6). *See Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (holding that a motion to dismiss is "not the proper vehicle for asserting a time bar"); *see also* Fed. R. Civ. P. 8(c)(1) (requiring statute of limitations defense to be raised in an answer). Under the "Third Circuit Rule," however, a defendant may raise a statute of limitations defense via a motion to dismiss if "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *Id*. (quoting *Hanna v. U.S. Veterans' Admin. Hosp.*, 514 F.2d 1092, 1094 (3d Cir. 1975)).

Pennsylvania's two-year statute of limitations for personal injury actions applies to Weaver's constitutional and state law claims. *See Graziano v. Pennsylvania Dep't of Corr.*, 2023 WL 6389756, at *14 (W.D. Pa. Sept. 30, 2023) (citing *Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985); and *Urrutia v. Harrisburg County Police Dept.*, 91 F.3d 451, 457 n.9 (3d Cir. 1996)). "A

9

claim alleging deliberate indifference to serious medical needs accrues when the plaintiff knows or has reason to know that deliberate indifference is displayed." *Matos-Ramirez v. Northampton Cnty. Jail Med. Expert*, 2021 WL 3722262, at *4 (E.D. Pa. Aug. 23, 2021) (citing *Smith v. Municipality of Lycoming Cty.*, 335 Fed. Appx. 147, 149 (3d Cir. 2009). *See also Macon v. Gressel*, 2024 WL 3497434, at *7 (W.D. Pa. July 22, 2024). Stated differently, the statute of limitations for a deliberate indifference claim will begin to run when the "Plaintiff became aware of the fact that he wasn't receiving appropriate treatment." *Id.* (citing *Campbell v. Doe*, 2017 WL 349289, at *3 (D.N.J. Jan. 24, 2017)). Wellpath argues that Weaver's claims accrued, and the statute of limitations commenced to run, on October 9, 2018, when he first experienced vision problems following his cataract surgery. *See* ECF No. 12, p. 6 (citing ECF No. 1, ¶ 11). If Wellpath is correct, the statute of limitations on Weaver's claims will have expired on October 9, 2020, two years after their accrual and almost three years before he commenced this action.

Weaver argues that his claims did not accrue until a date within two years of his commencement of this action because his Complaint "relates to an ongoing denial of timely medical care." ECF No. 14, p. 6. The Court understands this argument as invoking the "continuing violation doctrine." "The continuing violation doctrine, where applicable, provides an 'exception to the normal knew-or-should-have-known accrual date.'" *Powell v. Wetzel*, 2016 WL 8731445, at *9 (M.D. Pa. Sept. 13, 2016), *report and recommendation adopted*, 2016 WL 8710470 (M.D. Pa. Sept. 30, 2016) (quoting *Gonzales v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (quoting *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999)). A "continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *Sandutch v. Muroski*, 684 F.2d 252, 254 (3d Cir. 1982) (quoting *Ward v. Caulk*, 650 F.2d 1144, 1147 (9th Cir. 1981), *abrogated on other grounds by Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997)). "This doctrine

10

operates as a type of tolling and is often applied to address injuries that are the 'collective result of many non-actionable' slights." *Patterson v. Strippoli*, 639 Fed. Appx. 137, 141 (3d Cir. 2016) (quoting *Major Tours, Inc. v. Colorel*, 799 F. Supp. 2d 376, 387 n.3 (D.N.J. 2011)). *See O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006) (noting that the doctrine applies to hostile-environment claims, which are "designed explicitly to address situations in which the plaintiff's claim is based on the cumulative effect of a thousand cuts, rather than on any particular action taken by the defendant"). The doctrine does not apply to "[d]iscrete acts that are individually actionable…." *Powell*, 2016 WL 8731445, at *9 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113-114 (2002)). And "the continuing violation doctrine does not apply when the plaintiff 'is aware of the injury at the time it occurred.'" *Montanez*, 773 F.3d at 481 (3d Cir. 2014) (quoting *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 417 n.6 (3d Cir. 2003)). But where the plaintiff "alleges a continuous pattern of deliberate indifference that resulted in a cumulative injury, applying the doctrine is appropriate."[2]  *Stuart v. Pierce*, 587 F. Supp. 3d 127, 136 (D. Del. 2022).

Weaver has alleged such a pattern of deliberate indifference to his serious medical needs in this case. The Complaint alleges that beginning in October of 2018, when Weaver first experienced vision impairment in his left eye following surgery, he made repeated requests for medical attention that were followed by instructions regarding steps he should take to pursue

---

[2] The running of the statute of limitations is also tolled while an inmate exhausts his prison's administrative remedies as required by the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e *et seq*. *See Pearson v. Sec'y Dep't of Corrections*, 775 F.3d 598, 603-04 (3d Cir. 2015). In this case, however, PLRA administrative tolling would not save Weaver's claims unless the statute of limitations did not accrue or was otherwise tolled under some other legal doctrine. This is because Weaver did not file his grievance against Wellpath until June 1, 2022, well-beyond October 9, 2020, the date Wellpath argues the statute of limitation expired. While PLRA exhaustion will toll the running of the statute of limitations, it cannot resurrect a claim that is already time-barred. Therefore, to secure the benefit of PLRA tolling, Weaver must demonstrate that his claims did not accrue or otherwise were tolled beyond June 1, 2022. As explained *infra*, he has done so based on the continuing violation doctrine, and having done so, he need not invoke PLRA tolling because his commencement of this action on August 29, 2023 falls within the two-year statute of limitations.

11

treatment, which he followed, and periodic assurances that he would receive treatment. Weaver's allegations, accepted as true, plausibly support a pattern of deliberate indifference that resulted in undue delay in treatment and cumulative injury. *See* ECF No. 1, ¶ 54. Weaver alleges repeated efforts to secure treatment through prison processes followed by a continuum of arguable stonewalling and delay. Based on these allegations, it cannot be said as a matter of law that his claims are based on any discrete acts rather than continuing deliberate indifference. Therefore, any further analysis of Wellpath's statute of limitations affirmative defense must await a more developed record. *See McPhee v. DePuy Orthopedics, Inc.*, 989 F. Supp. 2d 451, 465 (W.D. Pa. 2012) (whether the statute of limitations barred certain claims was "not apparent from the face of the Complaint" because the court could not "determine[e] the date on which the cause of action accrued," and so could not "calculate the expiration of the ... statute of limitations period."). *See also Graziano v. Pennsylvania Dep't of Corr.*, 2023 WL 6389756, at *16; *Johnston v. Wetzel*, 431 F. Supp. 3d 666, 676 (W.D. Pa. 2019) (noting the "rationale underlying the continuing violation doctrine" applied to a claim based on seventeen years of treatment in solitary confinement). Accordingly, Wellpath's motion to dismiss Counts I and II of the Complaint based on the statute of limitations will be denied.[3]

      B.      The Complaint states a cause of action.

Wellpath argues that Weaver has failed to allege facts sufficient to state an Eighth Amendment claim against it. *See* ECF No. 12, pp. 7-15. Wellpath begins with the uncontroversial proposition that its liability under 42 U.S.C. § 1983 cannot be premised on a theory of vicarious

---

[3] In an email to Chambers staff on December 6, 2023, counsel for Wellpath stated Wellpath's intention to abandon its statute of limitations argument, leaving the motion to dismiss to be decided on its challenge to the merits of Weaver's *Monell* claim. Counsel for Weaver was copied on the email. Counsel stated he would confirm this position in a reply brief. When no reply brief had been filed by May 23, 2024, Court staff inquired of counsel for the Wellpath by email regarding Wellpath's intentions and were advised that a reply brief would be filed the next day. Counsel for Weaver was also copied on this email exchange. To date, however, no reply brief has been filed, prompting the Court to conclude that Wellpath had reconsider its intention to waive this argument on its motion to dismiss.

or respondeat superior liability. In *Monell v. Dep't Soc. Servs. of Cty. Of New York,* the United States Supreme Court held that a municipality may be liable under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury that the government as an entity is responsible." 436 U.S. 658, 694 (1978). This same standard applies to private corporations, like Wellpath, that provide governmental services—here medical services to inmates—pursuant to a contract with the state. *See Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 n.4, 583 (3d Cir. 2003) ("*Monell* applies to other private organizations faced with liability under § 1983."). To state a claim against "a private corporation providing medical services under contract with a state prison system, a plaintiff must allege a policy or custom that resulted in the alleged constitutional violations at issue." *Palakovic v. Wetzel*, 854 F.3d 209, 232 (3d Cir. 2017) (citing *Natale*, 318 F.3d at 583–84). In other words, whether the defendant is a governmental entity or a private corporation performing the functions of a governmental body, it may be liable under § 1983 for the constitutional violations committed by its subordinates only when they acted pursuant to its policies, customs, or practices. *See id*. Therefore, Weaver may prevail on his § 1983 claim against Wellpath only if he establishes that "there was a relevant [Wellpath] policy or custom, and that the policy caused the constitutional violation" for which he seeks relief. *See Natale*, 318 F.3d at 583-84. Weaver's Complaint alleges facts, which if proven, would permit findings that Wellpath's policies and practices regarding the timing and substance of its responses to inmate medical requests reflected deliberate indifference to inmate medical needs and caused the violation of Weaver's Eighth Amendment rights.

At Count I, Weaver alleges that "Wellpath has established … separate policies and/or practices which directly caused the delay in diagnostic treatment that Weaver suffered, in regards

13

to the serious medical need presented by his sudden loss of vision on October 9, 2018." ECF No. 1, ¶ 65. In support of this general allegation, Weaver singles out two Wellpath policies/practices. First, he points to Wellpath's policy of requiring inmates to "request medical care for non-emergency conditions via Sick Call slip or Requests to staff combined with its practice of not requiring its employees "to timely respond to 'Requests to Staff' directed to the medical department." *Id.*, ¶¶ 66-67. This policy and practice, Weaver maintains, unreasonably delays inmate medical care for serious, but non-emergency medical needs. *Id.*, ¶ 68. Second, Weaver identifies an alleged Wellpath policy and practice of prohibiting or delaying inmates' receipt of medical treatment prescribed or recommended by a medical provider until the prescribed or recommended treatment has been subjected to "collegial review" or "utilization review" and approved by a regional medical director. *Id.*, ¶¶ 70-71. This policy, Weaver asserts, is intended to limit "the number of medical consultations and medical care outside the prison facility, for which it is required to bear the cost," thereby causing undue delay in inmates receiving necessary treatment for serious medical needs. *Id.*, ¶¶ 72-76.

Weaver has not identified by name an ultimate policymaker at Wellpath who adopted the policies alleged in the Complaint. But, at this early stage in the litigation, where "the court simply considers the pleadings," his allegations are sufficient to support an inference that a Wellpath policymaker adopted or approved the alleged policies. *Accord, Rudolph v. Wellpath*, 2023 WL 2563088, at *9 (M.D. Pa. Mar. 17, 2023). "Whether [Weaver] can prove what he has pleaded must await another day, and another court proceeding or motion in which we may look beyond the pleadings themselves." *Bennett*, 2018 WL 6072126, at *9. Therefore, Weaver's federal constitutional claims will be permitted to proceed. Accordingly, Defendants' motion to dismiss

will be denied as to Count I.[4]

A separate order follows.

DATED this 30th day of July, 2024.

BY THE COURT:

_____
RICHARD A. LANZILLO
CHIEF UNITED STATES MAGISTRATE JUDGE

---

[4] Wellpath's motion to dismiss and accompanying brief challenges Weaver's state law negligence claim solely based on the statute of limitations, which challenge the Court addressed *supra*. Because Wellpath has not otherwise challenged Weaver's state law claim, the Court will continue to exercise its supplemental jurisdiction over Weaver's state law professional negligence claim at Count II of the Complaint.